1

2

**FILED**

3

MAR 1 1 2003

4

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

5

BY _____
DEPUTY CLERK

6

7

8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10 JACKIE TATES,                    )
                                   )
11            Plaintiff,            )    CIV S-00-2539 OMP P
                                   )
12     v.                          )
                                   )    **FINDINGS OF FACT AND**
13 LOU BLANAS, Sheriff,            )    **CONCLUSIONS OF LAW**
   KEVIN FARRELL, et al.,          )
14                                 )
              Defendants.          )
15

16 **PANNER, J.**

17     Plaintiff Jackie Tates is a pre-operative transgender, male

18 to female, pretrial detainee at the Sacramento County Main Jail

19 (the "Jail").  Tates contends his constitutional rights are

20 violated by the conditions of his confinement.  He brought this

21 *pro se* civil rights action in November 2000 against Sacramento

22 County Sheriff Lou Blanas and two Jail employees, Captain B.

23 Kelly and Classification Deputy Kenneth Farrell.  This case was

24 transferred to me in March 2002.

25     I previously determined that Tates is not entitled to

26 recover damages from Defendant Farrell, citing qualified

143

1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  immunity.  I denied defendants' motion for summary judgment
2  regarding Tates' prayer for prospective injunctive relief.[1]

3     During the course of this case Tates raised new issues that
4  were closely related to the matters before the court.  They shed
5  light on whether his rights had been violated, the credibility of
6  exhibits and testimony previously received, and whether relief
7  was warranted.  I agreed to consider these additional matters in
8  the instant proceeding.  All issues addressed in this opinion
9  have been the subject of one or more grievances that were not
10 satisfactorily resolved.  Plaintiff has exhausted his
11 administrative remedies as to those issues.

12    I conducted a court trial, by telephone, on October 28 and
13 November 14, 2002.  On January 6, 2003, I viewed portions of the
14 Jail and received additional evidence including live testimony.
15 I now issue my findings of fact and conclusions of law in
16 accordance with Federal Rule of Civil Procedure 52(a).  Any
17 finding of fact more properly characterized as a conclusion of
18 law, and any conclusion of law more properly deemed a finding of
19 fact, should be so construed.

20                         **Findings of Fact**

21 **Plaintiff Tates**

22    Plaintiff Tates is a 36-year old biological male who has
23 self-identified as female for at least the past 18 years.  Tates

24 _____

25  [1] As noted in the prior opinion, the order granting IFP status
    erroneously authorized service upon only Defendant Farrell.  With
26  the consent of all parties, Sheriff Blanas has been treated as a
    *de facto* defendant for purposes of the prayer for prospective
    injunctive relief.

2 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  is around 5'6" tall.  He[2] weighed approximately 125 pounds when
2  he arrived at the Jail, and about 154 pounds at the time of
3  trial.  He has not had sex change surgery yet, but is receiving
4  female hormone treatment.  He has described himself as "a very
5  effeminate transgender."  His voice, appearance, and demeanor are
6  consistent with his self-identified gender.  His breasts are
7  sufficiently enlarged that the Jail medical staff authorized
8  issuing him a bra.  Tates wears women's clothing when not
9  incarcerated, but--apart from requesting a bra for support--he
10  wears men's clothing while in jail.

11      This action was commenced during Tates' confinement as a
12  pretrial detainee at the Jail between October 20, 2000 and April
13  2001.[3]  Tates was next housed at Sacramento County's Rio Cosumnes
14  Correctional Center in Elk Grove, California, from April 2001
15  until mid-August 2001.  From there, he was transferred to Patton
16  State Hospital and Atascadero State Hospital, for psychiatric
17  evaluation in connection with his underlying criminal case.
18  Tates was returned to the Sacramento Main Jail on or about
19  February 20, 2002, where he remains to this day.[4]

20
21      [2]   For purposes of this litigation, Tates chose to have the
     court refer to him using masculine pronouns, because he is in a
22  men's jail.

23      [3]   The court heard conflicting testimony on the dates of
     certain moves.  The dates stated above are based primarily upon
24  the Jail records in Ex. 110.  Any discrepancies in those dates
     are not material to the result.

25
     [4]   As the court was about to file this opinion, it received
26  word that Tates may have been transferred to the Rio Cosumnes
     facility.  Assuming it is true, that would not moot this case,
     for the reasons stated elsewhere in this opinion

3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    Tates has several prior felony convictions.  He admits prior
2  arrests for robbery, burglary, and impersonating a peace officer.
3  He is currently detained pending trial on charges of sending a
4  threatening letter to the governor of California.  Tates pled not
5  guilty by reason of insanity, and has been undergoing psychiatric
6  evaluations.  On or about December 11, 2001, the Medical Director
7  of Patton State Hospital certified that Tates "is now mentally
8  competent" to stand trial.

9    Tates' written submissions to the court reflect a high
10 degree of anxiety, obsession, and perhaps paranoia.  However,
11 during all court hearings, Tates behaved appropriately and
12 appeared to have little difficulty comprehending the proceedings
13 and rationally articulating his contentions.  That Tates may have
14 psychological issues does not, in itself, preclude the
15 possibility that his allegations may have merit.  In fact, a
16 number of his factual assertions in this case ultimately have
17 proven to be undisputed.  Cognizant of the psychological concerns
18 and his prior convictions, I have carefully scrutinized his
19 allegations and sought independent corroboration when possible.
20 In many instances, the court heard substantially similar
21 testimony from inmate witnesses who had little opportunity or
22 motive to coordinate their stories.

23 **The Main Jail**

24    The Main Jail opened in 1989.  It presently houses
25 approximately 2200 to 2300 inmates at any given time, more than
26 double its original design capacity.  Defendants describe the

4 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1 Jail as "extremely full." The floors the court viewed were
2 divided into three "pods," each containing a "dayroom." Cell
3 doors line the dayroom walls. A small window in each cell door
4 lets guards peer inside the cell, and lets inmates view the
5 dayroom. A typical pod has around 32 cells, arranged in two
6 tiers. Most cells house two inmates, which equates to about 64
7 inmates per pod. The three pods on each floor are designed so a
8 central control booth monitors all three pods, and remotely locks
9 or unlocks individual cell doors.

10 The cells appeared to be roughly 6' x 10' in dimension.
11 Bunks, a toilet and sink, and two inmates, all must fit within
12 that space, leaving little room for other in-cell activities.
13 The shower and telephones are accessible only from the dayroom,
14 as is the television. The Jail also has some fenced "outdoor
15 recreation" facilities.

16 **The T-Sep Classification**

17 Upon arrival at the Jail, each inmate is "classified" by a
18 Classification Officer. Most inmates are classified as "general
19 population." Inmates believed to require special protection
20 (e.g., those particularly susceptible to victimization by other
21 inmates, or likely to be the target of an attack) are housed in
22 "protective custody" (aka "P.C."). Inmates who violate rules can
23 be punished by placement in a special disciplinary category with
24 very restricted privileges. The final classification mentioned
25 in the record is "total separation," usually abbreviated as "T-
26 sep." There may be other classifications, but Defendants have

1  not disclosed those to the court.

2       Despite ample opportunity, defendants have provided the
3  court with relatively little information concerning the T-sep
4  classification.  They have said it is not a disciplinary
5  classification.  In response to the court's questions at trial,
6  defendants named only two groups of inmates who are placed in
7  this category:  certain gang members, and transgender inmates.

8       T-sep inmates are housed in the same pods as other inmates,
9  but forbidden to have any contact with other inmates or even to
10  be in the same room as them.  As discussed below, T-sep inmates
11  are subject to many burdens and restrictions not shared by other
12  inmates.

13       Tates did not ask to be classified as T-sep.  Rather, the
14  Jail automatically classifies all biologically male transgender
15  inmates as T-sep, regardless of their behavior, criminal history,
16  whether they pose a danger to others, or any other
17  characteristic.  Although Jail policy requires that each inmate's
18  classification be periodically re-examined, in practice an
19  exception is made for transgender inmates, since there is no
20  possibility that the Jail will change their classification.

21       Since his arrival at the Jail, Tates has repeatedly asked to
22  be placed in the general population or, in the alternative, to be
23  moved to the "P.C. Unit where I can get active program,
24  recreational with other inmate's, rather than isolation program .
25  . . ."  His requests were all denied.  In response to a
26  grievance, Plaintiff was informed that, "You will remain a T-Sep

6 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  for the duration of your stay. This topic has already been
2  addressed and you were given your final answer dated 12-5-00."
3  The latter document, which is signed by Defendant Farrell and
4  Captain Kelly, states:

5      This will be the last time a grievance will be answered
       when it deals with your classification status. Your
6      status will never change as long as you are housed at
       this jail.
7
   (emphasis added).
8
9      Defendants have repeatedly stated that Tates is classified
10  as T-sep solely because he is transgender, and Defendants fear he
   might be harmed and they be held liable if he were given a less
11  restrictive classification. Defendants have not asserted, nor is
12  there any evidence to show, that he was classified as T-sep
13  because he will likely try to harm a Jail employee or other
14  inmate, or poses a particular risk of escaping, or for
15  misconduct, or any reason unrelated to his transgender status.[5]
16  **Other Transgender Inmates at the Sacramento Main Jail**
17
18      The Jail does not house a large number of transgender
   inmates, but it is not a unique circumstance either. The Jail
19  presently houses at least two transgender inmates, Plaintiff
20
21

22  [5]  Defendants' expert witness speculated that Tates must be a
23  disciplinary problem because of the number of housing moves shown
   in his jail record. An examination of those documents reveals
24  that the vast majority of "moves" were routine and lasted no more
   than a few hours, e.g., attending court, or meeting with a nurse,
25  social worker, or attorney. Several other "moves" were initiated
   by the Jail staff due to abuse directed against Tates. There
26  were also inter-facility transfers. The court received no
   evidence that Tates had significant disciplinary problems at the
   Jail.

1  Tates and Luis(a) Espinoza,[6] and possibly more.  There are
2  references in the record to at least four other male to female
3  transgenders who were inmates at the Jail at some point during
4  this case.  In addition, the court heard testimony regarding
5  transgender inmates at other correctional institutions.

6       Given past patterns, it is likely that at any given time the
7  Jail will house at least some transgender inmates.  Issues such
8  as the classification of transgenders, and their conditions of
9  confinement, will continue to be a concern even after Tates moves
10  onward.  The record also reflects that the conditions Tates
11  complains of are shared by other transgender inmates.

12  **Housing Tates Separate from General Population**

13       I initially thought that Defendants had acted properly in
14  segregating transgenders from the general Jail population.
15  Additional evidence received during the court trial, and an
16  evaluation of all the testimony, makes clear that Defendants
17  acted without due consideration of all factors and the rights of
18  transgenders.

19  **Shackling**

20       The Jail treats transgender inmates in a manner ordinarily
21  reserved for the most dangerous inmates.  Unlike most other
22  inmates, those classified as T-sep are heavily shackled and
23  manacled while transported to court, or being moved inside the

24

25       [6]  I have used feminine pronouns when referring to Espinoza, in
26  accordance with her expressed preference.  The court had an
     opportunity to observe her at trial.  Her appearance, voice, and
     demeanor are consistent with her self-identified gender.

8 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  jail, and even while in a holding cell.  This is done without
2  regard to whether the particular individual poses a risk to the
3  safety of other inmates or the staff, or is a threat to escape.
4  During the trial in this case, Tates was brought into the
5  courtroom wearing leg shackles and manacles chained to his waist.
6  Despite the presence of numerous deputies in the room, Defendants
7  proposed to keep Tates shackled in this fashion throughout the
8  day-long trial.

9      Defendants insist such treatment is mandatory because Tates,
10  and other transgender inmates, are classified as T-sep.  However,
11  the Jail ostensibly classifies transgenders as T-sep solely to
12  protect them from being victimized.  Defendants have failed to
13  establish any legitimate reason for automatically treating
14  transgender inmates as inherently more dangerous than most other
15  inmates.  The court had an opportunity to observe both Tates and
16  Luis(a) Espinoza during the trial.  Neither appears to pose a
17  significant threat to Jail employees or other inmates, as
18  compared to the risk posed by other inmates in general.  There
19  was testimony to the contrary, that while Tates occasionally is
20  depressed, he is always compliant and cooperative with Jail
21  employees and medical staff.  Defendants offered no evidence to
22  the contrary.

23  **Religious Services**

24      Transgender inmates are prohibited from attending religious
25  services or bible study with other inmates, due to their T-sep
26  classification.  In theory, a Chaplain is available for one-on-

9 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  one prayer sessions with transgender inmates, which Tates has
2  requested.  In practice this almost never occurs.  Plaintiff
3  attributes this to bias, but there are more plausible
4  explanations.  One is overcrowding.  The Jail holds 2300 inmates,
5  but has only one Chaplain and a couple of assistants.

6      Chaplain Ortiz also testified that, because Plaintiff is
7  classified as T-sep, Jail rules require that a guard be present
8  at all times when he meets with Tates.  As guards are in short
9  supply, Chaplain Ortiz is rarely able to meet with Tates or other
10 transgender inmates.  Chaplain Ortiz has not expressed any fear
11 of Tates or requested that a guard be present.  Rather, this
12 appears to be an unintended and unnecessary consequence of
13 classifying transgender inmates as T-sep.  The floors viewed by
14 the court had conference rooms, visible from the control room,
15 that would allow the Chaplain to meet with Tates and other
16 transgender inmates without compromising safety or security and
17 without a guard being present in the room.

18     Tates and Espinoza both testified that their written
19 requests for a Bible went unanswered for a long time.

20 **Dayroom Access**

21     The Sacramento County Main Jail Operations Order on Dayroom
22 Use states that:

23         Access to dayrooms shall be provided to inmates on a
            daily basis under normal circumstances.  Use of the
24          dayroom is intended to help maintain the inmates'
            social and emotional health by allowing them to
25          participate in leisure activities.  The dayrooms shall
            also be used for meal service and for use of showers
26          and telephones . . . . General population inmates shall
            be given as much access to the dayroom as possible.

10 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1      As the Order recognizes, regular dayroom access is
2 important.  The cells are very small, and there is little in them
3 to occupy an inmate's time.  In addition, the shower and
4 telephones are accessible only via the dayroom.

5      General population inmates are usually allowed out in large
6 groups, either an entire pod or at least one tier.  The Main Jail
7 Operations Order makes special provision for T-sep inmates:

8     Each inmate on total separation status shall receive no
    less than one (1) hour of dayroom access daily.  The
9     dayroom shall not be used by more than one (1) Total
    Separation inmate at a time.
10

11      It is undisputed that Tates, and other transgender inmates,
do not receive dayroom access for at least one hour daily as
12
stated in the Jail policy.  On many days, they never leave their
13
cells.  Nor do transgenders regularly receive an average of one
14
hour of dayroom daily, *i.e.,* seven hours per week.  Instead,
15
Defendants have sought to reframe the issue in terms of whether
16
Tates receives the minimum three hours per week required by state
17
law, citing Cal. Admin. Code title 15, § 1065(a).
18

19      Defendants produced *in camera* a logbook that records the
amount of time that Tates and other inmates on his floor received
20
dayroom during a period of several months.  Tates disputes the
21
accuracy of those records, insisting that guards sometimes
22
falsely record an hour of dayroom time when he received just ten
23
minutes, or write that he refused dayroom time or outdoor
24
recreation when in fact it was never offered to him.  Tates
25
argues that, after being cooped in his cell for so long, he would
26
not pass up the opportunity to use the dayroom or outdoor

11 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1 recreation areas, or take a shower.  Defendants did not produce
2 any witness who actually saw Tates using the dayroom or heard him
3 refuse dayroom time.  Instead, they rely entirely upon the
4 business records hearsay exception.

5      It is not necessary to resolve this dispute.  Even assuming
6 the accuracy of the logbook, it is undisputed that Tates and
7 other transgender inmates receive less dayroom and outdoor
8 recreation than other inmates, both in terms of quantity and
9 quality.  This is largely a product of the Jail's decision to
10 prohibit transgender inmates from having contact with other
11 inmates, including each other.

12      When a T-sep inmate uses the dayroom, all other inmates must
13 be excluded.  Faced with the choice of letting thirty general
14 population inmates use the dayroom for an hour, versus a single
15 transgender inmate, the guards understandably try to accommodate
16 the greater number.  Indeed, requiring all other inmates to
17 remain in their cells so a single inmate can use the dayroom may
18 trigger resentment towards that one inmate, even though he is not
19 at fault.

20      In addition, because the Jail prohibits T-sep inmates from
21 using the dayroom together, the available T-sep time must be
22 divided among the T-sep inmates.  This significantly reduces the
23 time allotted to each.

24      The dayroom time Tates does receive is often late at night
25 while most other inmates are asleep, *i.e.*, between 11:00 p.m. and
26

12 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1 | 4:00 a.m.[7]  For example, during the week of June 23, 2002, Tates
2 | received only 13 minutes of dayroom time between the hours of
3 | 6:00 a.m. and 8:00 p.m.  Two thirds of his total dayroom time
4 | that week was between the hours of midnight and 5:00 a.m.  Tates
5 | has complained about this unusual schedule.  Among other things,
6 | confining dayroom usage to late night hours limits his ability to
7 | make telephone calls to friends, family, or attorneys.

8 |      Lt. Powell explained that if the Jail doesn't provide
9 | transgenders enough dayroom time to satisfy state minimums during
10 | normal hours, the Jail makes it up during the night.  This effort
11 | is admirable.  Nevertheless, "dayroom" at two or three in the
12 | morning is not a comparable substitute for dayroom during normal
13 | hours, at least on a regular basis, unless the inmate prefers
14 | those hours for some reason.

15 |      Transgender inmates are forbidden to participate in
16 | recreational activities with other inmates, or to exercise or
17 | interact with them.  Consequently, their activities in the

18 |

---

19 | [7] The unusual hours may explain some of the "refusals" recorded
in the logbook.  The logbook shows he was offered dayroom use at
20 | 2:11 a.m. on June 23, but declined.  On the night of June 27-28,
Tates was in the dayroom for an hour and 40 minutes, from 11:47
21 | p.m. to 1:27 a.m.  He was then offered dayroom at 1:33 a.m. on
June 28 --six minutes after the end of the prior session-- but
22 | "refused."  The logbook also shows refusals at 11:50 p.m. on July
11; 12:05 a.m. on July 17; 2:25 a.m. on August 17; 2:15 a.m. on
23 | September 7; 1:10 a.m. on September 10; 11:50 p.m. on October 8;
and 2:05 a.m. on October 18.  It is not clear from the logbook
24 | whether Tates was even awake when he allegedly "refused" dayroom
on these occasions.

25 |      Some other refusals recorded in the logbook, if accurate,
26 | seem less justified, *e.g.*, during normal hours.  Tates insists he
never refused dayroom.  The record is insufficient to make a
finding on that issue.

13 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    dayroom, or outdoor recreation, are very limited.  They can't
2    play games, cards, sports, or even talk to another person.  Tates
3    claims he is now prohibited from even talking to any other
4    inmate.  He has suffered severe depression and emotional distress
5    as a result of his isolation, which has lasted almost two years.
6    Judging by the enormous volume of correspondence the court has
7    received from Tates, he is extremely lonely and bored, with
8    little to occupy his time each day.  He has also gained 30 pounds
9    since arriving at the Jail, which is consistent with inactivity.

10       Tates has repeatedly been denied permission to use the
11   dayroom with other transgender inmates.  This refusal is
12   puzzling.  Allowing two transgender inmates to use the dayroom
13   together would effectively double the amount of time available
14   for each, or reduce the total time that must be reserved for
15   transgender inmates, freeing up more time for others.  It also
16   would enhance the quality of recreational activities available,
17   while helping to alleviate the effects of long-term solitary
18   confinement.

19       There is no evidence in the record that transgender inmates
20   are more likely than other inmates to act inappropriately while
21   in the dayroom together, and in any event they would be in full
22   view of the guards.  Defendants have suggested that there can be
23   a "pecking order" even among transgenders, but point to no
24   evidence that Tates and Espinoza are likely to harm each other.
25   Nor have Defendants made a case-by-case determination.  Rather,
26   Defendants' refusal to let transgenders share dayroom time is

14 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   premised on a rigid classification-based argument: all
2   transgenders are T-sep, and T-seps are forbidden to have contact
3   with any other inmate.

4   **Sanitation**

5   Tates has repeatedly complained that his cell was filthy and
6   asked that it be cleaned or that he be issued cleaning supplies.
7   The court's examination of his cell during the tour was
8   inconclusive.  Tates was relocated days before the scheduled tour
9   for reasons apparently unrelated to the court's visit, and his
10  prior cells had been cleaned and repaired despite the court's
11  order to the contrary.  Tates testified that he had never seen
12  those cells so clean during the entire time he was there.  Tates
13  also testified that a defective faucet that would spray water at
14  him was repaired after he was transferred out of the cell.

15  Some conditions Tates complained of, such as plugged vents,
16  are common to many cells.[8]  Tates also complained of graffiti,
17  which was present in large quantities but would not endanger his
18  health.

19  However, the court finds that the cells of Tates, Espinoza,
20  and other transgenders are cleaned far less often than the cells
21  of other inmates.  Defendants essentially concede this point, but
22  insist it is not the result of animosity.  Most Jail inmates are
23  issued cleaning supplies to maintain their own cells, or else

24

25  [8]  The focus of this case is upon alleged disparities between
26  the treatment received by Tates as compared to non-transgender
    inmates.  I express no opinion regarding overall Jail conditions,
    as that issue is not before me.

15 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   inmate trustees perform the cleaning chores.  However, T-sep
2   inmates are never furnished cleaning supplies, apparently on the
3   theory they might use those materials to harm someone.  Nor could
4   trustees enter and clean Tates' cell unless the dayroom was first
5   emptied of all other inmates and a guard was present at all
6   times, since his T-sep status precludes Tates from being around
7   any other inmate, even a trustee.  Consequently, Tates' cell was
8   infrequently cleaned.  A trustee described it as "pretty nasty,"
9   and testified that Espinoza's cell was rarely cleaned either.
10  The latter testified that her cell was cleaned only once during a
11  four month period.

12  **Showers**

13      Inmates ordinarily[9] can shower only when permitted to use
14  the dayroom.  Since T-sep inmates are given limited access to the
15  dayroom, Tates and other transgender inmates often must go two or
16  more days without a shower, and sometimes up to a week.  There
17  was unrefuted testimony that Tates, Espinoza, and other
18  transgender inmates are permitted to shower less often than other
19  inmates.  The record also contains grievances that Tates filed
20  requesting a shower.  They are corroborated by the logbook, which
21  shows he had not been allowed out of his cell during the stated
22  period.  Defendants appear to have responded when prompted by a
23  formal grievance, but it is impractical to require transgender
24  inmates to file a grievance each time they need a shower.

25

26  [9]    The logbook indicates that inmates on disciplinary
    restrictions may be allowed out specifically to use the shower,
    but not for general dayroom use.

16 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1 | **Request for a Bra**

2      After arriving at the Jail, Tates asked for a bra.  In a
3 grievance response dated December 3, 2000, and signed by Sgt.
4 Brown and Captain Kelly, the Jail categorically refused to issue
5 Tates a bra so long as he "still had a functioning penis and
6 testicles."  "You are a male inmate and therefore I am unable to
7 allow you to have a womans bra."  The Jail attributed this
8 decision to both the medical staff and classification officers;
9 however, there is no evidence in the record that the medical
10 staff has adopted such a policy.

11      On or about November 18, 2002, *i.e.*, between sessions of the
12 court trial, the Jail medical staff authorized issuance of a bra
13 to Tates for the duration of his stay.  Once the trial was over,
14 Sgt. Banning allegedly confiscated Tates' bra and refused to
15 return it.  Tates says he was told this action was due to a
16 ruling by this court, though I am aware of no such ruling.  Tates
17 claims to be in "great pain" as a result of the lack of physical
18 support.  Tates has submitted post-trial documents showing that
19 on January 24 and January 31, 2003, the medical staff again
20 authorized issuance of a bra to him for the duration of his stay.

21      In deciding to issue a bra, the Jail medical staff
22 presumably took into consideration the potential that a bra can
23 be used as a weapon to strangle a person or as a noose in a
24 suicide attempt.  Tates has made suicidal statements during the
25 course of this case, and his Jail admission records evidence past
26 suicide attempts.  Eight suicides reportedly took place at the

1 Jail in a recent 12 month period.[10]

2 **Derision, Harassment, and Abuse**

3 The court heard extensive testimony regarding ridicule and
4 abuse allegedly directed at transgender inmates including Tates.
5 Examples include the use of language such as "he/she," "it,"
6 "faggot," "bitch," "queer," and "homo;" serving transgenders'
7 meals on the floor; grabbing their breasts or commenting on their
8 physical attributes; threats of rape and other comments of a
9 sexual nature; and unprovoked threats of violence.

10 Luisa Espinoza testified that she hears jokes about her
11 daily; she was forced to dig in a trash can for items she needed;
12 her food is served on the floor; she was asked to display her
13 breasts; her cell was cleaned only once in four months; she often
14 does not receive a response to her "kites;" her request for a
15 Bible was ignored; and some guards simply ignore her when she
16 speaks to them or makes requests.

17 Tates and Espinoza also complain that, to obtain clean
18 clothes, they are forced to walk bare-breasted while the entire
19 pod watches the show through the cell door windows.  They find
20 this humiliating.

21 Most of the alleged abuse originated with other inmates,

22

23

24 [10] Ordinarily I would not mention matters not formally offered
as evidence, but the recent rash of suicides at the Sacramento
25 County Main Jail has received extensive publicity in the
community.  It also is documented in the official records of the
26 Jail and Coroner, and other official reports.  Certainly it is
something that Jail officials are aware of and understandably
must be very concerned about.

18 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  including trustees.[11]   The Jail relies upon the latter, instead
2  of regular employees, to reduce operating costs.  I find that the
3  trustees are not being adequately policed by Jail employees.
4  There also is credible evidence that some guards have tolerated
5  abusive conduct directed at transgenders, and that inmates
6  believed they could harass transgenders without fear of
7  punishment.[12]   Jail deputies receive some diversity training at
8  the Academy, but apparently no training specifically concerning
9  transgenders.  I find that no reasonable attempts have been made
10 to train trustees and guards to stop the harassment that
11 transgenders are subjected to at the Jail.

12

13 Defendants' expert, William Naber, testified that many jails
14 do not segregate transgender inmates in the manner practiced at
15 the Sacramento County main Jail.  He opined that this option was
16 necessary at this Jail due to its particular design.  Naber
17 conceded that placing Tates in solitary confinement for several
18 years, without any review of his classification, would be
19 unconstitutional.  Naber asserted that Plaintiff's status had
20 been regularly reviewed, but his requests for reclassification
21 had simply been denied.  When confronted with the Jail's written

22

---

23 [11]   I have not considered certain allegations against Jail
     guards that were received after the trial, and which Defendants
24 are still investigating.

25 [12]   Plaintiff initially did not furnish the names of those
     persons who allegedly were mistreating him, which made it
26 difficult for the Jail to investigate his allegations or the
     court to evaluate them.  His more recent grievances have
     corrected that omission.

19 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  response to Tates--"[y]our status will never change as long as
2  you are housed at this jail"--Naber suggested that Jail officials
3  had probably "misspoken."

4      I find serious discrimination exists at this jail against
5  transgenders.  I find that this results from a failure of
6  Defendants to promulgate rules and discipline to protect
7  transgenders from discrimination.

8                    **Conclusions of Law**

9      Pre-trial detainees, such as Tates, are entitled to the same
10 constitutional protections as convicted criminal serving a
11 sentence.  See Gibson v. County of Washoe, Nevada, 290 F.3d 1175,
12 1187 (9th Cir. 2002); Frost v. Agnos, 152 F.3d 1124, 1128 (9th
13 Cir. 1998).  Courts must be careful not to usurp the legitimate
14 role of prison officials.  Nevertheless, there are occasions when
15 the federal courts must intercede to ensure that basic rights are
16 protected.

17      Transgender inmates pose unique concerns for prison
18 officials.  Prison officials cannot mistreat transgenders or deny
19 them the benefits available to all other inmates, simply because
20 of a bias against transgenders.  When appropriate, though, prison
21 officials can--and in some cases may even have a duty--to treat
22 transgenders differently, *e.g.*, to protect them from violence at
23 the hands of other prisoners.  Cf. Farmer v. Brennan, 511 U.S.
24 825, 833 (1994); Redman v. County of San Diego, 942 F.2d 1435
25 (9th Cir. 1991) (en banc).

26 / / /

1  Segregation of transgenders is not always required.   Some
2  correctional facilities choose to house transgenders with other
3  inmates not perceived as posing an undue risk of violent or
4  abusive behavior.   Such determinations necessarily depend upon a
5  variety of factors, including the design of the facility, whether
6  it is adequately staffed and not overpopulated, the number of
7  transgender inmates at the facility, and the characteristics of
8  the general inmate population (*e.g,* whether the pod houses
9  exclusively non-violent offenders).

10  The duty to protect Tates from harm may not be used to
11  justify actions not reasonably related to accomplishing that
12  purpose.   Defendants erred by automatically classifying all
13  transgender inmates as T-sep, as that classification is
14  administered at this Jail.   The necessary consequence of this
15  classification scheme is to needlessly deprive transgender
16  pretrial detainees of basic human needs and of privileges
17  available to all other inmates, and to needlessly subject
18  transgender inmates to harsh conditions, as discussed earlier in
19  this opinion.

20  At the conclusion of the court trial, I pointed out various
21  concerns, and asked Defendants "to file a post-trial brief
22  discussing whether it is really necessary to classify all
23  transgender inmates as T-Sep and whether a more suitable
24  classification exists or could be established that would take
25  into account their unique circumstances."
26  / / /

21 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1        Defendants responded that "it is necessary to classify
2   transgender inmates at the Sacramento County Main Jail as 'T-sep'
3   and there is no other classification that exists *or could be*
4   *established* . . ." Defendant's Post-Trial Brief, p. 2 (emphasis
5   added). The Jail's response is regrettable. I have no interest
6   in micro-managing the Jail, and will extend considerable
7   deference to reasonable decisions by Jail officials.
8   Nevertheless, I have a duty to ensure that Plaintiff's
9   constitutional rights are respected. Since Defendants have
10  declined my invitation to remedy the problems voluntarily, I will
11  order them to do make the necessary changes.

12       Defendants can, and must, adopt a classification scheme that
13  more appropriately addresses the special circumstances of
14  transgender inmates. Transgender inmates should not routinely be
15  shackled and chained in circumstances where other inmates would
16  not be subjected to such treatment. Transgender inmates should
17  be permitted to socialize with each other unless there are
18  particular safety concerns that would create an undue risk of
19  harm. Such determinations must be based upon facts, not phobias.

20       Defendants need not treat every transgender inmate in the
21  identical manner. If a particular transgender inmate is
22  determined to be especially dangerous, Defendants could still
23  classify that inmate as T-sep, or use shackles, so long as they
24  would have made the same decision even if that inmate were not
25  transgender. Likewise, transgender inmates are not immune from
26  discipline for rules violations.

22 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    The determination of whether or not transgenders can attend
2  group religious services must be made based on all factors and
3  not simply because the person is a transgender.  If a transgender
4  is barred from group religious services, the transgender must be
5  provided religious materials promptly and given prompt religious
6  counseling.  If Defendants believe a guard must be present,
7  Defendants must make the necessary arrangements.

8    Transgender inmates must be allowed reasonable use of the
9  dayroom, outdoor recreational facilities, and telephones during
10 normal hours, not just very late at night.  The Jail's Operations
11 Order specifies that inmates will ordinarily receive a minimum of
12 one hour of dayroom daily.  Other inmates receive at least that
13 much dayroom.  Transgender inmates must be similarly treated.

14   Transgender inmates must have an adequate opportunity to
15 shower, and to do so without being sexually assaulted or
16 harassed.  Their cells should be cleaned at least as often as
17 those of other inmates in the same pod.  If other inmates are
18 provided cleaning supplies, transgender inmates should be
19 similarly treated, absent reason to believe that a particular
20 inmate will abuse that opportunity.  If, for safety reasons, the
21 cells of transgender inmates must be cleaned by a Jail employee
22 or by a trustee with a guard present, then Defendants must see
23 that it is done.

24   With regard to Tates' bra, the possibility that it could be
25 misused as a weapon or noose must be balanced against any medical
26 or psychological harm to him resulting from denial of a bra.

23 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1 Defendants presumably have existing policies in place for
2 addressing these same concerns with regard to female Jail
3 inmates, some of whom may be suicidal and whose needs for support
4 vary. A similar analysis should apply here. I will leave the
5 final determination to Jail officials, including the medical
6 staff. Their decision must not be influenced by bias, nor may
7 Defendants apply a categorical rule as they previously did that
8 denies an inmate a bra simply because he is a transgender or is
9 housed in a men's ward.

10 Transgender inmates are entitled to be treated with the same
11 respect as other inmates. This attitude must be conveyed from
12 the top on down. Sheriff Blanas, and senior Jail officials, must
13 make it absolutely clear that abuse, ridicule, "faggot" jokes,
14 and other inappropriate behavior will not be tolerated--whether
15 by employees, trustees, or other inmates. Jail officials must
16 take appropriate disciplinary measures if that policy is
17 violated. An employee who witnesses such misconduct must report
18 it to the appropriate supervisor. This topic shall be addressed
19 when training new Jail employees, and in periodic refresher
20 training of existing employees.

21 Defendants have until Tuesday, April 1, 2003, to furnish the
22 court with a proposed plan for correcting the deficiencies noted
23 herein.

24 DATED this _/_ day of March, 2003.

25

26 OWEN M. PANNER
U.S. DISTRICT JUDGE

24 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
for the
Eastern District of California
March 11, 2003


\* \* CERTIFICATE OF SERVICE \* \*


2:00-cv-02539


Tate

    v.

Blanas

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  March 11, 2003, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

        Jackie Tates                          OMP
        X-3723485
        RCCC
        Rio Consumnes Correctional Center
        12500 Bruceville Road
        Elk Grove, CA   95758

        Terence John Cassidy
        Porter Scott Weiberg and Delehant
        PO Box 255428
        350 University Avenue
        Suite 200
        Sacramento, CA   95865


                            Jack L. Wagner, Clerk

                            BY: _____
                                Deputy Clerk